# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHARON BENJAMIN,
*on behalf of E.B.*,
     Plaintiff,

     v.

No. 3:17-cv-158 (VAB)

NANCY A. BERRYHILL,
*Acting Commissioner, Social Security
Administration*,
     Defendant.

## RULING ON CROSS-MOTIONS TO REVERSE THE DECISION OF THE COMMISSIONER AND FOR JUDGMENT ON THE PLEADINGS

Sharon Benjamin ("Plaintiff"), acting on behalf of her grandchild E.B., filed this administrative appeal under 42 U.S.C. § 405(g) against Nancy Berryhill, the Acting Commissioner of Social Security ("Defendant" or "the Commissioner"), seeking to reverse the decision of the Social Security Administration ("SSA") denying E.B.'s claim for Title II disability insurance benefits under the Social Security Act. Compl. at 1, ECF No. 1.

Ms. Benjamin moves for an order reversing the decision of the Commissioner. Mot. to Reverse, ECF No. 17. The Commissioner moves for an order affirming her decision. ECF No. 15.

For the following reasons, the Court vacates and remands the Commissioner's decision for reconsideration of: (1) whether E.B. has an impairment that meets or medically equals the listing, 20 C.F.R. § 404, Subpart P, Appendix 1, Impairment 112.11; (2) whether E.B. has an impairment that functionally equals the listing because of her ability or inability to acquire and

use information, 20 C.F.R. § 416.926a(b)(1); and (3) whether E.B. has an impairment that functionally equals the listing because of her ability or inability to attend and complete tasks, 20 C.F.R. § 416.926a(d).

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Allegations

#### 1.    Home and Social Life

E.B., born on October 31, 2001, and eleven years old at the time of the application for Supplemental Security Income (SSI), was under the custody of her grandmother, Sharon Benjamin, for eight years before applying for benefits. Tr. 37–38, 143–44. Custody of E.B., who was the victim of neglect and had witnessed domestic violence, was transferred to Ms. Benjamin because E.B.'s mother had been evicted several times and was arrested. Tr. 37–38, 518. E.B. continues to see her parents for several days each week and during the summer. Tr. 48. E.B. had some trouble transitioning to her grandmother's house and had conflicts with other children living there. Tr. 38. In response, Ms. Benjamin brought E.B. to a doctor, who diagnosed E.B. with attention deficit hyperactive disorder (ADHD). Tr. 38.

E.B. continues to have conflicts with individuals in the house, including her cousins. Tr. 38. She needs reminders to do chores, brush her teeth, and bathe. Tr. 39. She does not respond well to being told "no," and throws tantrums once or twice per week. Tr. 40–41. She does not have many friends her own age, and has difficulty getting along with her peers. Tr. 41–42. She also interrupts adults and can cause problems with them. Tr. 42.

E.B. is easily distracted when doing homework and cannot sit still long enough to watch a movie. Tr. 43. There is a dog at Ms. Benjamin's house, whom E.B. loves and helps care for. Tr. 48. She often does not sleep through the night. Tr. 49.

### 2. Performance in School

E.B.'s school has made certain accommodations for her: she is in special education classes with small numbers of students, she works with a social worker at the school, and she has company at all times. Tr. 42. She has been in conflicts with other students, including one incident where a boy was poking her and she threatened to hurt him with a pencil, scissors, and a stapler. Tr. 44; *see also* Tr. 591 (noting that E.B. was suspended from school for three days).

When E.B. was placed in a smaller class, her performance in school improved, and she began to earn A's and B's. Tr. 46–47. She did still, however, have tantrums at school and struggled to concentrate on her homework. Tr. 47.

### 3. Medical Evidence

#### a. Thomas Gorin, M.D.

E.B. received medical care relevant to this appeal from Thomas Gorin, M.D., at Mansfield Pediatrics. *See, e.g.*, Tr. 421.

In June 2012, Dr. Gorin noted E.B. was struggling at school, was receiving special education, visited a therapist weekly, and had challenges with her peers. *Id.* Dr. Gorin diagnosed her with attention deficit hyperactivity disorder ("ADHD"). *Id.*

In December 2012, Dr. Gorin noted E.B. continued to have problems at school: her teacher reported she was very distracted and had some problems with peer relationships, especially in the afternoon, even while taking a small dose of Adderall at noon. Tr. 427.

In April 2013, Dr. Gorin reported that E.B.'s behavior at school had improved since she had become involved with a program at the Joshua Center, a program associated with Natchaug Hospital in Mansfield, Connecticut. Tr. 475. Dr. Gorin prescribed Prozac, Intuniv, and Vyvanse. *Id.*

In July 2013, Dr. Gorin noted E.B. had continued to participate in the Joshua Center program and would participate in a partial hospitalization program there in the fall. Tr. 477. She was no longer seeing a psychiatrist, but she was seeing a therapist. *Id.* E.B.'s grandmother told Dr. Gorin that E.B. was still very hyper, especially when her medication wore off, and that she became agitated when her parents visited. *Id.* She was taking Trazodone, Vyvanse, Prozac, and Intuniv. *Id.*

In September 2013, Dr. Gorin noted E.B. had been attending the partial program at the Joshua Center after school. Tr. 551. He also noted that E.B.'s grandmother expressed concern about E.B.'s outbursts, which she reported were increasingly frequent and difficult to control. *Id.* E.B. talked about leaving home to live with neighbors, and reported that, despite taking Trazodone at night, she struggled to sleep through the night. *Id.* Dr. Gorin diagnosed her with hyperactivity and oppositional defiant disorder. *Id.*

On November 1, 2013, Dr. Gorin stated E.B. could participate in all activities, including sports, without restriction, and her physical examination findings, including her psychiatric examination, were unremarkable. Tr. 546–50.

On April 1, 2014, E.B. visited Dr. Gorin with dizziness and sore throat. Tr. 537–39. On April 28, 2014, Dr. Gorin lowered her dose of Vyvanse because she was not gaining weight, and he reported that E.B.'s ADHD subtype was primarily hyperactive-impulsive. Tr. 534. Dr. Gorin noted that E.B.'s comorbid illnesses included conduct disorder, depression, Tourette's syndrome, and anxiety. *Id.* Side effects of her medication included anorexia and weight loss. *Id.* E.B.'s physical examination findings were unremarkable. Tr. 534–35.

In June 2014, Dr. Gorin noted E.B.'s performance in sixth grade had worsened, and that she was not completing her homework. Tr. 531. E.B. continued to have problems with attention

and impulsivity. *Id.*; SMF at 4 n.2. Dr. Gorin noted E.B.'s ADHD had been poorly controlled

since her last visit. Tr. 531. He also noted she was "being followed by a psychologist," and was

experiencing side effects of her medication, including "problems sleeping, but no anorexia, no

abdominal pain, no tics, no weight loss and no listless behavior." *Id.*

       In September 2014, Dr. Gorin noted E.B.'s performance in seventh grade was the same

and she continued not to complete her homework. Tr. 528. She also continued to be hyperactive,

impulsive, and to have trouble concentrating. *Id.* A neuropsychologist had evaluated E.B. and

diagnosed her with ADHD and a learning disability. *Id.*

       In October 2014, Dr. Gorin noted E.B. had been suspended from school for threatening to

stab another student. Tr. 579. She was having problems with impulsive behavior after replacing

Vyvanse with Adderal at a lower dose, but had been eating and sleeping better, and her

grandmother was working with a therapist on improving these outbursts. *Id.*

      **b.**     **Natchaunt Hospital and Hartford Healthcare Behavioral Health Network**

       On January 18, 2013, before the application period, E.B. was referred by her therapist,

Ann Pacheco, to Natchaung Hospital for ADHD and concerns about her grades dropping, temper

tantrums, and possible depression and self-harm. Tr. 403–04. She saw Paul Weigle, M.D. Tr.

412. He noted that she had ADHD symptoms, some present from before the age of seven; had

"difficulty sustaining attention in tasks or play"; and had trouble listening, following instructions,

and finishing homework. Tr. 410; *see also id.* at 441–42 (noting she lost her temper several times

a week, defied adult rules, blamed others for misbehavior, and was easily annoyed, angry, and

resentful). She was diagnosed with ADHD, hyperactive, oppositional defiant disorder, and

depressive disorder NOS. Tr. 406, 410. Her global assessment of functioning (GAF)[1] score was 45, and her highest GAF score in the past year had been 55. Tr. 407, 410–11. According to her discharge papers, E.B. began treatment at the Joshua Center at the partial hospitalization program level of care on January 24, 2013. Tr. 447–51.

E.B. attended behavioral programs at the Joshua Center, for two hours each day, initially every day and eventually three days a week. Tr. 45; 53; 447–51. The programs helped E.B. manage social situations and manage her behavior. Tr. 45. E.B. attended psychotherapy groups, psycho-education groups, clinical creative rehabilitation groups, individual therapy, and family therapy. Tr. 450; 467.

Ms. Benjamin reports the Joshua Center programs have helped E.B. "in some ways," but that she continues to throw temper tantrums regularly. Tr. 46. E.B.'s records from the Joshua Center indicate she was underweight, agitated, hyperactive, attention-seeking, and impulsive. Tr. 525. Additionally, she was emotionally reactive, defiant, and had poor social skills. Tr. 526.

On October 22, 2014, E.B. was again referred to the Joshua Center by her therapist, Ann Pacheco, and was admitted for treatment for oppositional behavior, aggression, and inability to sustain attention. Tr. 591. She had been suspended from school for three days for threatening to cut another student's hair with scissors, stab him with a pencil, and hit him with a stapler. Tr. 591. Her GAF score was 43. Tr. 591.

On October 29, 2014, E.B. saw Dr. Weigle because she was struggling with impulsiveness, excessive and loud talking, negativity, and complaining. Tr. 615. Ms. Benjamin

---

[1] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning. Scores between 51 and 60 indicate moderate symptoms or moderate difficulties in those settings. *See Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, American Psychiatric Association (1994).

reported that E.B. had been doing well at home. *Id.* Dr. Weigle found that E.B. minimized her difficulties, was short with him, and made poor eye contact. *Id.* Additionally, she was guarded, appeared younger than her age, restless, and irritable, but her mood was good and her memory was intact. *Id.* Her attention and concentration were impaired, her thoughts were logical and linear, she had not shown suicidal or homicidal ideations, her insights were poor, and her judgment was fair. Tr. 616–17. She was diagnosed with ADHD, combined type, oppositional defiant disorder, depressive disorder, NOS, and learning disorder. Tr. 617. Dr. Weigle prescribed Vyvanse and discontinued Adderall. Tr. 619.

On November 5, 2014, E.B. saw Dr. Weigle again, and he noted she was irritable and disruptive, rambled, seemed to have poor social skills, and was guarded, restless, and her attention and concentration were impaired. Tr. 611. Her thoughts were logical and linear, and her cognitive function was at baseline without existing deficits. *Id.* Her diagnoses were the same and her GAF score was 44. Tr. 612–13.

Discharge papers from the Joshua Center, dated January 6, 2015, indicated that E.B. had high energy, was very verbal, and was impulsive during her time there, which had a negative impact on her peer relationships. Tr. 593. She made moderate progress regulating her behavior but continued to make impulsive comments that angered her peers. *Id.* She had learned skills to manage her behavior and control her impulses, and her behavior at home showed improvement. *Id.* Her diagnoses remained the same and her GAF score was 52. Tr. 592.

### 4.     State Agency Non-Examining Consultants

On April 19, 2013, Christopher Leveille, Psy.D., and Jeanne Kuslis, M.D., reviewed E.B.'s medical and educational records and concluded that her severe impairments did not meet, medically equal, or functionally equal the Listings of Impairments. Tr. 63. Dr. Leveille found

that E.B. had a less than marked impairment in terms of acquiring and using information, that E.B. had average intelligence, and that she did not have cognitive or learning impairments. Tr. 63–64. Dr. Leveille also found that E.B.'s behavioral problems disrupted her learning. Tr. 64. Dr. Leveille found that E.B. had less than marked limitations in attending and completing tasks, finding that E.B.'s ADHD was being treated. Tr. 64. She found that E.B. had less than marked limitations in interacting and relating to others, and any conflicts were improving with treatment. Tr. 63–64. Dr. Leveille also found that E.B. did not have limitations caring for herself. *Id.* Dr. Kuslis found that E.B. had no problems moving about and manipulating objects, and less than marked limitations with health and physical well-being. Tr. 64.

On July 15, 2013, Mano Kulathungam, M.D., and Susan Uber, Ph.D., reviewed E.B.'s record on reconsideration. Tr. 69–78. They found that E.B.'s severe impairments did not meet, medically equal or functionally equal the Listings of Impairment. Tr. 74. They also found that E.B. had less than marked limitations or no limitations in the five categories. Tr. 75.

### 5. Vengopal Thangada, M.D.

On July 17, 2014, Dr. Thangada performed a psychiatric evaluation of E.B. on a referral from Dr. Gorin. Tr. 587–89. E.B. had trouble paying attention, was easily distracted, unable to sit still, angry at school, and had difficulty making friends. Tr. 587. Dr. Thangada stated that E.B. was alert and oriented, maintained eye contact, and was able to speak about problems she was having. Tr. 588. He diagnosed E.B. with a mood disorder, ADHD, combined type, and reactive attachment disorder. Tr. 589. He gave her a GAF of 50. *Id.* He recommended she continue counseling and continue to take her medications. *Id.*

### 6. Karina Gitman, Ph.D.

On August 19, 2014, on a referral from Ann Pacheco, Dr. Gitman performed a neuropsychological evaluation of E.B. Tr. 554. E.B. was having trouble with impulsivity, inattention, distractibility, and struggled with transitions, times of change, and socializing. Tr. 555. She would sometimes hit her head on the wall, bite, and kick; had trouble calming down; and had meltdowns regularly. Tr. 555. Dr. Gitman's diagnostic impression was that E.B. exhibited inattention, hyperactivity, and impulsivity, indicative of attention deficit hyperactivity disorder, combined type. Tr. 562. Her other diagnoses included a learning disorder, rule out language disorder and rule out depressive disorder. Tr. 563. Dr. Gitman found unequivocal evidence of inattention processes, impulsivity, and hyperactivity. Tr. 562.

### 7. Ann Pacheco, L.M.F.T.

Beginning in December 2013, E.B. visited with Ms. Pacheco on a weekly basis. Tr. 649. Ms. Pacheco stated that, despite medication, E.B. had a long history of behavioral and emotional disturbances. Tr. 649. She stated that E.B. had ADHD; was impulsive, inattentive, and hyperactive; had had behavioral issues with peers at school; and had difficulty making and keeping friends. Tr. 649–50. Ms. Pacheco worked with E.B. on managing her behavior and regulating her emotional outbursts. Tr. 651. She felt there had been minimal progress in E.B.'s ability to predict consequences and make decisions based on those consequences. *Id.*

### 8. School Records, School Evaluations, and Teacher Questionnaire

Ms. Deirdre Cilley, E.B.'s special education teacher, performed an educational evaluation on E.B. Tr. 187–91; 197–201. Her report stated that E.B.'s oral and academic skills were in the low-average range. Tr. 201. Her fluency with academic tasks and her ability to apply academic skills were within an average range. *Id.* She had average scores in broad reading, reading

comprehension, brief reading, broad written language, written expression, and brief writing. *Id.* She had low scores in broad mathematics, math calculation skills, and brief mathematics. *Id.*

In February 2013, Mr. Jeffrey Danforth, Ph.D., prepared a psychological evaluation of E.B.. He noted that, in fourth grade, E.B. had trouble with attention and distractibility, and needed adult support to complete work, based on her report card. Tr. 208. In fifth grade, she received accommodations, including small classes and extra time to complete assignments. *Id.* E.B. performed far below grade level for reading, writing, science, and social studies, and somewhat below grade level for spelling and math. *Id.* She did not complete class assignments or homework. *Id.* Dr. Danforth performed a number of tests on E.B., and, based on those results, recommended individual therapy, behavior management training and plan, and school accommodations. Tr. 216–19.

Ms. Linda Rogers, M.Ed., a reading and language arts consultant, prepared a report that showed E.B.'s language skills were at least two years below grade level. Tr. 196. Overall, E.B. performed best in writing, and had trouble with listening comprehension. *Id.*

E.B. had an individualized education program ("IEP") that reflected that she had an emotional disturbance; as a result, she received 4.5 hours of special education and 1 hour of social work services each week, as well as untimed testing. Tr. 256–57. She needed support starting and completing assignments, and had trouble interacting with peers. Tr. 260. This IEP stayed in place through 2014, and eventually a new goal to improve her ability to attend to classroom activities, complete tasks, and follow directions was added. Tr. 300. In May 2014, her special education hours were increased to 11.5 hours per week. Tr. 380. In November 2014, her special education hours were increased to 26.25 hours per week. Tr. 358.

On May 8, 2013, Ms. Cilley and Dan White, the school principal, completed a Teacher Questionnaire for E.B. Tr. 220–27. They did not assess serious problems with performing activities, but did note E.B. performed below grade level. Tr. 220–21. She had trouble paying attention, focusing, finishing assignments, carrying out multi-step instructions, taking turns, and working without distraction. Tr. 222. E.B. did not have trouble carrying out single-step instructions or changing from one activity to another. *Id.* She also had "obvious" problems with seeking attention, following directions, making and keeping friends, expressing anger appropriately, asking permission appropriately, following rules, respecting adults, relating experiences and telling stories, and taking turns in conversations. Tr. 223.

She also had a slight problem calming herself when upset, handling her frustration, being patient, identifying emotional needs, responding to changes in her mood, and using coping skills. Tr. 225. She cared for her personal hygiene, physical needs, taking her medication, using good judgment about personal safety, and asking for help. Tr. 225. She had shown "significant improvement" in her behavior. Tr. 227.

Carolyn Fishman, M.A., M.S., CCC-SLP, prepared a speech and language screening report that indicated that E.B.'s language skills were within the average range, but that E.B. was frequently out of her seat and often interrupted the teacher. Tr. 568.

E.B's first round of grades in the 2014–2015 school year, from Parish Hill Middle School, were: B- in Math, D+ in English, C- in science, D+ in school success skills, C- in physical education, and A in chorus. Tr. 338. Her second round of grades that year, from Mansfield CDT, were: A in reading, language arts, science, art, and physical education, B in math, and B+ in social studies. Tr. 383.

### B.    Procedural History

On March 4, 2013, Ms. Benjamin filed for Supplemental Security Income (SSI) disability benefits, claiming that, because of ADHD, oppositional defiant disorder (ODD), dysthymia, and temper dysregulation, her minor grandchild E.B. had been disabled since February 2, 2013. Tr. 143–51, 178; 58. On April 22, 2013, the application was denied, and on July 18, 2013, it was denied again on reconsideration. Tr. 79–87.

On April 20, 2015, Administrative Law Judge ("ALJ") Sharda Singh had a hearing, and on June 22, 2015, ALJ Singh found E.B. was not disabled within the meaning of the Social Security Act. Tr. 9–29. ALJ Singh found that E.B. did not have a disability that met or medically equaled a disability listed at 20 C.F.R. § 404, Subpart P, Appendix 1, and that her disabilities did not functionally equal any of those listed because she had only one marked limitation, in interacting and relating with others; less than a marked limitation in acquiring and using information, attending and completing tasks, caring for herself, and physical health and well-being; and no limitation in moving about and manipulating objects. Tr. 18–24.

Ms. Benjamin requested a review from the Appeals Council, which was denied. Tr. 1–6. As a result, the decision of the ALJ became the final decision of the Commissioner. Tr. 1–6.

On February 3, 2017, Ms. Benjamin appealed to this Court. Compl., ECF No. 1.

## II.    STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also Moreau v. Berryhill*, 3:17-cv-00396 (JCH), 2018 WL 1316197, at *3 (D. Conn. 2018) ("Under section 405(g) of title 42 of the United States Code, it is not a function of the district court to

review de novo the ALJ's decision as to whether the claimant was disabled . . . . Instead, the court may only set aside the ALJ's determination as to social security disability if the decision 'is based upon legal error or is not supported by substantial evidence.'") (internal citation omitted) (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)).

The ALJ's decision is supported by substantial evidence if there is "more than a mere scintilla" of evidence to support the conclusion. *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). Substantial evidence "means such *relevant* evidence as a *reasonable* mind might accept as adequate to support a conclusion." *Id.* at 447–48 (quoting *Moran*, 569 F.3d at 112). This standard of review is "very deferential." *Id.* at 448 ("But it is still a very deferential standard of review—even more so than the 'clearly erroneous' standard.") (citing *Dickson v. Zurko*, 527 U.S. 150, 153 (1999)).

## III.    DISCUSSION

On E.B.'s behalf, Ms. Benjamin moves to reverse the decision of the Commissioner, arguing that the ALJ failed to adequately assess E.B.'s disability because she failed to discuss evidence in the record that would support a finding that E.B. has a disability medically equal to or functionally equal to a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. Mot. to Reverse at 5–6, ECF No. 17-1; *see also* 20 C.F.R. § 416.924(d) ("Your impairment(s) must meet, medically equal, or functionally equal the listings."). Ms. Benjamin argues that "there was a significant amount of documentation" that E.B. had marked hyperactivity, inattention, and impulsiveness. Mot. to Reverse at 5–6. Ms. Benjamin argues ALJ Singh erred by finding that E.B. had only one marked limitation (interacting and relating with others), and argues E.B. also has marked limitations in attending and completing tasks and caring for herself. *Id.* at 8.

The Commissioner moves to affirm her decision, arguing that, based on evidence in the record, E.B. did not meet the definition of a disabled child under the Social Security Act ("SSA"). Mot. for J. on Pleadings at 1 ("Comm. Mot."), ECF No. 22-1. The Commissioner argues the ALJ properly followed the three-step analysis required by 20 C.F.R. § 416.924, and found that (1) E.B. had not engaged in substantial gainful activity during the relevant time period; (2) E.B. had severe impairments of ADHD, ODD, and asthma; and (3) E.B.'s impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404. *Id.* at 4–5 (citing Tr. 15).

A minor applicant for Social Security Income ("SSI") is considered disabled if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The Commissioner determines whether a child is disabled by following a three-step process. 20 C.F.R. §§ 416.924(a)-(d). First, the ALJ determines whether the child is engaged in substantial gainful activity, which would disqualify her from benefits. 20 C.F.R. § 416.924(b); *see also* 20 C.F.R. § 416.972 (defining "substantial gainful activity"); 42 U.S.C. § 1382c(a)(3)(C)(ii)("Notwithstanding clause (i), no individual under the age of 18 who engages in substantial gainful activity (determined in accordance with regulations . . . may be considered to be disabled.").

Second, the ALJ determines whether the child has a medically determinable impairment or combination of impairments that causes more than minimal functional limitations. 20 C.F.R. § 416.924(c). Third, the ALJ determines whether any impairment found in Step Two meets, medically equals, or functionally equals the criteria included in the listing of impairments at 20

C.F.R. Part 404, Subpart P, Appendix 1; 20 C.F.R. § 416.924(d). If the child is found to meet an impairment medically, then the child will be found disabled. 20 C.F.R. § 416.926. If not, the ALJ will assess whether a functional impairment "results in limitations that functionally equal the listings [of medical impairments]." 20 C.F.R. § 416.926a(a).

To determine whether a functional impairment is equivalent to a medical impairment, the ALJ considers "(1) How well [the child] can initiate and sustain activities, how much extra help [the child] need[s], and the effects of structured or supportive settings (see § 416.924a(b)(5)); (2) How [the child] function[s] in school (see § 416.924a(b)(7)); and (3) The effects of [the child's] medications or other treatment (see § 416.924a(b)(9))." 20 C.F.R. § 416.926a(a). The ALJ considers how the child functions in activities by considering the child's ability to (i) acquire and use information; (ii) attend and complete tasks; (iii) interact and relate with others; (iv) move about and manipulate objects; (v) care for himself or herself; and (vi) by considering the child's health and physical well-being. *Id.* § 416.926a(b)(1). An "impairment(s) functionally equals the listings if it is of listing-level severity," either because the child has a "marked" limitation in two of the six categories, or an "extreme" limitation in one category. *Id.* § 416.926a(d).

A child has a marked limitation when an impairment "interferes seriously with [his or her] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(2). A marked limitation means more than moderate and less than extreme. *Id.* An extreme limitation is an impairment that "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities," and is the rating the SSA gives to "the worst limitations." *Id.* § 416.926a(e)(3).

### A. The ALJ's Application of the Three-Step Process

#### 1. Step One

In this case, at step one, the ALJ found that E.B. had not engaged in substantial gainful activity. Tr. 15; *see* 20 C.F.R. § 416.924(b) ("If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or age, education, or work experience."). The Court agrees; there is no evidence in the record that E.B. was engaged in substantial gainful activity.

#### 2. Step Two

Second, the ALJ found that E.B. had three severe impairments: ADHD, ODD, and asthma, and that those "restrictions on the claimant's ability to communicate and to breath due to these conditions significantly impair her ability to do basic work activities." Tr. 15; *see* 20 C.F.R. § 416.924(c) (stating that, to qualify for SSI benefits, "[y]ou must have a medically determinable impairment(s) that is severe"). The parties do not contest that E.B. had these three severe impairments.

#### 3. Step Three

Third, the ALJ found E.B. did not have an impairment that met or was medically equal to a severe impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1; *see also* 20 C.F.R. § 416.924d ("Your impairment(s) must meet, medically equal, or functionally equal the listings."); *id.* § 416.925 (stating that the purpose of the Listing of Impairments for children "describes impairments that cause marked or severe functional limitations"); *id.* § 416.926 (defining medical equivalence to the Listing of Impairments as "at least equal in severity and duration to the criteria of any listed impairment")). In reaching this conclusion, the ALJ stated she "also

considered the opinion of the State agency medical consultant who evaluated this issue and reached the same conclusion." Tr. 15.

### 1. Medical Impairment

Ms. Benjamin argues that, other than noting that she relied on the opinion of the State agency medical consultant, "the ALJ offered no explanation as to why she did not believe E.B. did not meet or medically equal a listed impairment." Mot. to Reverse at 5. In particular, Ms. Benjamin argues that the ALJ failed to explain why she did not find E.B.'s described hyperactivity, inattention, and marked impulsiveness equivalent to attention deficit disorder under listing 112.11. *Id.* at 6 (citing Tr. 43, 209, 404, 477, 525, 528, 562, 566, 570, 587, 591, 598, 601, 602, 610, 615, 616, 649 (hyperactivity); Tr. 41, 43, 208, 209, 222, 259–60, 270, 289, 290, 300, 404, 406, 409, 410, 427, 439, 528, 531, 555, 557, 562, 570, 572, 587, 588, 591, 606, 611, 616, 649 (inattention); Tr. 38, 46–47, 208, 209, 211–13, 289, 403–04, 408, 409, 410, 438, 525, 526, 528, 531, 551, 555, 562, 570, 572, 579, 587, 588, 591, 593, 598, 601, 602, 603, 611, 615, 649, 650, 651, 652 (marked impulsiveness)). Ms. Benjamin argues that "[i]t was error not to discuss and weigh the severity of these symptoms and clinical signs under this listing." Mot. to Reverse at 6. Ms. Benjamin argues that, because "there was no discussion and rationale for the findings at step three regarding whether [E.B.] met the requirements of any of the listings for mental disorders, in particular, the children's listing 112.11 (ADHD)," E.B. could not "know why this claim was denied for not meeting or medically equaling this listing." *Id.* at 7. The Court agrees.

The Commissioner does not address Ms. Benjamin's argument that E.B. has an impairment that meets or medically equals attention deficit disorder under listing 112.11. *See, e.g.*, Mot. to Affirm at 6 (addressing as a first argument whether ALJ reasonably concluded that

E.B.'s impairment functionally equaled a listed impairment, which is the next step in the analysis).

Under 20 C.F.R. Part 404, Subpart P, Appendix 1, "neurodevelopmental disorders" are a category of mental disorder. 20 C.F.R. § 404, Subpart P § 112. Within that category, subsection 112.11 is listed as attention deficit hyperactivity disorder. *Id.* The SSA explains that, in childhood cases, "severity is measured according to the functional limitations imposed by the medically determinable mental impairment," relative to "different stages of maturation." *Id.* § 112(C). A "marked" limitation "means more than moderate but less than extreme," and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." *Id.* In addition, the SSA directs that "[a]ttention must be given to the effect of medication on the child's signs, symptoms, and ability to function," and "[i]n cases where overt symptomatology is attenuated by the use of such drugs, particular attention must be focused on the functional limitations that may persist." *Id.* § 112(F).

The Court agrees with Ms. Benjamin that the ALJ did not provide an adequate explanation of why E.B. does not have an impairment that meets or medically equals listing 112.11. When an ALJ rejects a claim that a claimant has a listed impairment, the ALJ must provide a rationale for that decision. *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982) ("[I]n future cases in which the disability claim is premised upon one or more listed impairments of Appendix 1, the Secretary should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment."); *see also Isureal v. Berryhill*, No. 3:15-cv-00221 (JAM), 2018 WL 1409797, at *2 (D. Conn. Mar. 21, 2018) (explaining that a reviewing court could

affirm by considering the administrative record, but noting that "*Berry* also warned that, because a reviewing court's task is made much more difficult when no express reasoning is given, 'in future cases in which the disability claim is premised upon one or more listed impairments of Appendix 1, the Secretary should set forth a sufficient rationale in support of his decision to find or not find a listed impairment" and directing ALJ on remand to "provide a sufficient reasoned explanation to permit this Court to review that conclusion").

The Court therefore remands the decision to provide a basis for determining that E.B.'s ADHD is not an impairment that meets or medically equals listing 112.11 of Appendix 1.

### 2. Functional Equivalent of an Impairment

The ALJ also found E.B. did not have an impairment or combination of impairments that functionally equaled any impairment listed at 20 C.F.R. Part 404. Tr. 15. The ALJ explained that, "[a]fter considering the evidence of record, . . . the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" Tr. 17.

Ms. Benjamin argues the ALJ erred by finding that E.B. had marked limitations in only one domain. *Id.* at 7–8. Ms. Benjamin argues E.B. has a marked limitation in attending and completing tasks and caring for herself. *Id.* at 7, 14. For the following reasons, the Court agrees that the Commissioner did not sufficiently explain her reasoning for finding that E.B. had only one marked limitation.

### a. Ability to Acquire and Use Information

In considering whether E.B. had a limitation in her ability to acquire and use information, the ALJ determined that because E.B. "achieved superior grades during the period at issue," her

academic performance precluded a finding of a marked limitation in her ability to acquire and use information. Tr. 18–19 (citing Exhibit 21E; 20 C.F.R. § 416.926a(g)(2)(iv), and (3), SSR 09-3p).

A child between ages six and twelve should be able to read, write, perform math calculations, and discuss history and science, and should be able to use these skills in academic and daily settings. 20 C.F.R. § 416.926a(g)(2)(iv). A child between ages twelve and eighteen should be able to use skills learned at school in daily living situations without assistance, should be "able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas)," and should be able to "apply these skills in practical ways that will help [the child] enter the workplace after [the child finishes] school (e.g., carrying out instructions, preparing a job application, or being interviewed by a potential employer)." 20 C.F.R. § 416.416.926a(g)(2)(v).

The Court agrees the ALJ did not sufficiently weigh evidence in the record other than E.B.'s grades, including the reports of her treating physician, the teacher questionnaire, her other therapists, and the testimony from Ms. Benjamin. *See Keene ex rel. J.T. v. Astrue*, 901 F. Supp. 2d 339, 349–50 (N.D.N.Y. 2012) (finding "the hearing officer did not sufficiently weigh the evidence of the record" when the officer found that a child did not have a limited ability to acquire and use information because the child had two average standardized test scores but failed to consider the testimony of the consulting physician, the hearing officer's own observations of the child, consider the rest of the record, or weigh alternative evidence). The ALJ did not, for example, weigh evidence about E.B.'s IEP, under which, by the end of 2014, E.B. was supervised for 26.25 hours per week at school. Tr. 256–57, 300, 380, 358. The ALJ also did not

consider evidence that E.B. was performing below grade level or that she had been struggling in the fourth and fifth grades. Tr. 208, 216–19.

The Court therefore will remand this case to the ALJ to provide sufficient reasons— including evidence that E.B. has the ability to acquire and use information "in academic situations to demonstrate what [she has] learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions," and also that she can "use these skills in daily living situations at home and in the community." 20 C.F.R. § 416.926a(g)(2)(iv); *see also Keene*, 901 F. Supp. 2d at 350 ("Even if the hearing officer's ultimate conclusion was potentially supportable, the Court ought not affirm a decision where there is a reasonable basis for doubting whether the appropriate legal standards were applied."). The ALJ in this case did not support her conclusion that E.B. has the ability to acquire and use information in her daily life. She also did not discuss—and either find credible or not—evidence in the record that, at some points in the relevant period, E.B.'s grades in school were not good. *See, e.g.*, Tr. 528, 531 (noting E.B.'s poor performance in the sixth and seventh grades). The Court therefore remands this decision to the ALJ to provide substantial evidence supporting a conclusion of whether E.B. is able to acquire and use information.

### b.     Ability to Attend and Complete Tasks

Next, the ALJ considered whether E.B. had a limitation in attending and completing tasks, a "domain [that] considers how well a child is able to focus and maintain attention, and how well she is able to begin, carry through, and finish activities, including the mental pace at which she performs activities and the ease of changing activities." Tr. 19 (citing 20 C.F.R. §

416.926a(h)). Again, in this domain, the ALJ found that E.B.'s superior grades during the period at issue precluded her from having marked limitations in this domain. Tr. 19–20.

Ms. Benjamin argues that E.B.'s "school records, behavioral health records, psychological and neuropsychological reports and test results, opinions and observations from treating sources, the teacher questionnaire, and the testimony of the plaintiff support a conclusion that E.B. was markedly restricted in attending and completing tasks." *Id.* at 10.

The Commissioner argues that the ALJ's decision was supported by the evidence, "including Dr. Weigle's opinion, Ms. Cilley's report, Dr. Leveille and Dr. Uber's opinions, as well as the reported improvement in EB's symptoms with medication, and her academic achievement." Mot. to Affirm at 7 (citing Tr. 64, 73–75, 222, 571). The Commissioner argues that the "consensus of the medical provider and educators[] who considered EB's functioning in this domain" found she "did not have any serious difficulties performing and completing tasks, and maintaining attention." *Id.* (citing Tr. 17–18).

The Court acknowledges, as the Commissioner argues, that the ALJ does note the opinion evidence of E.B.'s treating physician, Dr. Paul Weigle, and finds that E.B. had "'obvious' problems with: 1) acquiring, learning and using new information, 2) focusing or maintaining attention on activities or tasks and performing activities or tasks that are developmentally age-appropriate at a consistent pace, 3) initiating and sustaining emotional connections with others and responding to criticism; and 4) coping with stress and changes in environment and taking care of her own health, possessions, and living area[.]" Tr. 17. The ALJ concluded that, although Dr. Weigle described E.B.'s problems as "obvious," the doctor did not describe her problems as "serious." *Id.* (finding also that this assessment was supported by E.B.'s 2013 teacher). The ALJ also noted the observations of E.B.'s counselor, Ann. M. Pacheco,

LMFT, LLC, and found that, despite certain concerns, E.B. had made progress and, although she continued to have outbursts, "she was able to deescalate with adult intervention." *Id.*

The ALJ did not, however, apply any of these observations in the analysis of whether E.B. has a limitation in her ability to attend and complete tasks. Rather, the ALJ noted that, despite any problems E.B. has had in school that have required the attention of a paraprofessional aide, she "has achieved superior grades during the period at issue, academic performance that would be precluded by marked limitations in this domain." Tr. 20.

This analysis does not consider and either accept or reject any of the opinions of the physicians and counselors listed above, and, as discussed above, relies solely on E.B.'s grades to determine E.B.'s behavioral ability to, for example, "complete classroom and homework assignments," "sustain attention well enough to participate in group sports, read by herself, and complete family chores," avoid impulsive thinking, and prioritize and manage her time. 20 C.F.R. 416.926a(h). The record includes many examples of doctors commenting on E.B.'s struggle to complete assignments, focus, and control her impulses, and the ALJ neither accepts nor rejects these comments in this analysis, relying instead solely on E.B.'s grades. *See, e.g.*, Tr. 427 (Dr. Gorin reporting in December 2012 that E.B. was having problems in school with distractibility and peer relationships, even while taking a small dose of Adderall); Tr. 531 (Dr. Gorin noting that E.B.'s performance in sixth grade had worsened, she was not completing her homework, and was having problems with attention and impulsivity); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) ("According to [the treating physician rule], the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniquest and is not inconsistent with the other substantial evidence in [the] case

record.'") (quoting 20 C.F.R. § 404.1527(d)(2)). The Court therefore remands for the ALJ to provide sufficient reasoning for a finding that E.B. does not have a marked limitation in her ability to attend and complete tasks.

### c.     Interacting and Relating to Others

After considering E.B.'s ability to interact and relate to others, the ALJ concluded that E.B. had a marked limitation because she "[had] obvious deficits in her ability to control her temper and impulsivity during the period at issue and has been suspended from school for three days after she threatened a fellow student." Tr. 21. The ALJ also noted, however, that E.B. had responded well to an additional small dose of Adderall at noon and that she was alert and cooperative when receiving medical treatment.[2] *Id.* Ms. Benjamin does not challenge this finding, and the Court agrees the ALJ's decision was supported by substantial evidence.

### d.     Moving About and Manipulating Objects

The ALJ also found E.B. had no limitation in her ability to move about and manipulate objects because her "medical records do not document any physical limitations." Tr. 22 (citing Exhibit 9F, 13F). The Court agrees. Ms. Benjamin does not challenge this finding, and the record does not indicate E.B. had physical limitations that would have prevented her from moving about or manipulating objects. *See, e.g.*, Tr. 546–50 (physical examination normal and she could participate in activities such as group sports).

---

[2] The Court infers that the latter two statements weighed against finding that E.B. had an extreme limitation.

### e.      Caring for Oneself

The ALJ also considered whether E.B. had a limitation in her ability to care for herself, and found she had less than a marked limitation in that domain because "she is consistently reported to maintain adequate hygiene." Tr. 23.

Ms. Benjamin argues that "[t]he evidence soundly shows E.B. had a marked limitation in caring for herself," and argues that the ALJ failed to consider evidence such as "the emotional state of E.B. and how a wealth of evidence in the record showed she was seriously emotionally impaired." Mot. to Reverse at 14, 16; *see also* 20 C.F.R. § 416.926a(k)(2)(iv). Ms. Benjamin argues that the ALJ should have considered E.B.'s ability "to properly handle her emotions and cope with frustration, anger, or stress in an age-appropriate manner." *Id.* at 16.

The Commissioner responds that the ALJ considered medical and other evidence of record and "reasonably found that although EB had difficulties in this domain, they did not rise to the level of marked limitations." Mot. to Affirm at 12 (citing Tr. 22–23). The Commissioner also argues that the ALJ considered evidence from E.B.'s teacher, Ms. Cilley, who "found that EB had at most 'slight' problems performing tasks associated with this domain," and that E.B. had shown an improvement in her behavior, attitude and ability to get along with others. *Id.* at 12–13 (citing Tr. 17; Tr. 225). The Commissioner notes that the ALJ considered evidence from Dr. Weigle, who found that E.B. had slight difficulty meeting her physical and emotional needs, Tr. 17; Tr. 572, and Dr. Uber, who found that E.B. was easily irritable and had some behavioral dysregulation, but had shown improvement. Tr. 72, 75.

Under 20 C.F.R. § 416.926a(k)(1), caring for oneself depends on how well a child maintains "a healthy emotional and physical state, including how well [she gets her] physical and emotional wants and needs met in appropriate ways; how [the child copes] with stress and

changes in [her] environment; and whether [she takes] care of [her] own health, possessions, and living area." *Id.* § 416.926a(k)(1). This includes responding to environmental changes and "the daily demands of [an] environment" to cooperate with others and take care of oneself. *Id.* § 416.926a(k)(1)(i). Recognizing physical health symptoms and "making decisions that do not endanger" oneself is one element of whether a child is able to care for herself. *Id.* § 416.926a(k)(1)(iv). Children ages six to twelve should be independent in daily activities, able to identify circumstances when they feel good and when they feel bad, and avoid behaviors that are unsafe. *Id.* § 416.926a(k)(2)(iv). Children ages twelve to eighteen should be increasingly independent, and may "sometimes experience confusion in the way [they] feel about themselves," especially as they experience changes in their bodies, which may result in new worries, anxieties, and frustrations. *Id.* § 416.926a(k)(2)(v).

Here, the ALJ "fails to provide an [adequate] 'express rationale' for its conclusions" that E.B. does not have a marked limitation in the domain of caring for herself. *See Isureal*, 2018 WL 1409797, at *2 (quoting *Berry*, 675 F.2d at 468). In particular, the ALJ has not considered evidence that E.B. has meltdowns or temper tantrums at least once a week, and whether that evidence supports or is insufficient to support a finding that E.B. can manage the demands of her environment at an age-appropriate level. *See, e.g.*, Tr. 46, 403–04, 441–42. The Court therefore vacates and remands the ALJ's decision that E.B. had a less than marked impairment in her ability to care for herself.

### f. Health and Physical Well-Being

Finally, the ALJ found E.B. had less than a marked limitation in health and physical well-being because her records did not "document any ongoing symptoms that can be expected to cause marked limitations in this domain." Tr. 24. The ALJ explained that, although E.B. had

been diagnosed with asthma, "this impairment has been essentially stabilized with medication," and her symptoms, such as wheezing and respiratory infections, are intermittent, and she has exhibited no pulmonary symptoms during physical evaluations. *Id.* Ms. Benjamin does not challenge this conclusion, and the Court agrees with it and therefore affirms.

### 4. The ALJ's Conclusion

In sum, the ALJ found E.B. had one marked limitation: her ability to interact and relate to others. The ALJ found E.B. did not have an extreme limitation in any domain, and did not have a second marked limitation in any domain. The ALJ therefore determined E.B. had not been disabled since the date her application for disability benefits had been filed. Tr. 24.

The Court finds, however, that E.B.'s performance in school should not have categorically precluded her from having a limitation in the first two domains, ability to acquire and use information and ability to attend and complete tasks, and, therefore, the ALJ's conclusions require more support, given the substantial record detailing various issues regarding E.B.'s behavior. The Court also notes that the ALJ's findings about whether E.B. had a limitation in her ability to care for herself are not sufficiently supported.

## IV. CONCLUSION

For all of the foregoing reasons, Ms. Benjamin's motion for an order reversing the decision of the Commissioner is **GRANTED**. The Commissioner's motion for an order affirming the decision is **DENIED**.

The case is remanded to the Commissioner for proceedings consistent with this opinion.

SO ORDERED at Bridgeport, Connecticut, this 8th day of June, 2018.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE